UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

F I L E D
JAN 18 2019
CLERK'S OFFICE
DETROIT

- - - - - - - - - - - - - - - - - - - - x

United States of America,

                 Plaintiff,

      v.

IAV GmbH,

                 Defendant.

                     :
No. 16-CR-20394

HONORABLE SEAN F. COX

Offenses: (1) Conspiracy

Violations: (1) 18 U.S.C. § 371

Statutory Maximum Period of
Probation:
Five years

Statutory Minimum Period of
Probation:
None/Not Applicable

Statutory Maximum Fine: 18 U.S.C.
§ 3571(d) (the greater of twice the
gross gain or twice the gross loss)

Statutory Minimum Fine: None/Not
Applicable

- - - - - - - - - - - - - - - - - - - - x

## PLEA AGREEMENT

The United States of America, by and through the Department of Justice, Criminal Division, Fraud Section, the United States Attorney's Office for the Eastern District of Michigan, and the Department of Justice, Environment and Natural Resources Division, Environmental Crimes Section (collectively hereafter, "the Offices"), and the Defendant, IAV GmbH Ingenieurgesellschaft Auto und

· 1



GOVERNMENT
EXHIBIT
1

Verkehr (the "Defendant"), by and through its undersigned attorneys, and through its authorized representative, pursuant to authority granted by the Defendant and with the consent of the Supervisory Board and of the Shareholder Meeting, hereby submit and enter into this plea agreement (the "Agreement"), pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure. The terms and conditions of this Agreement are as follows:

1.    **Guilty Plea**

    A.    **Waiver of Indictment and Venue**

    Pursuant to Fed. R. Crim. P. 11(c)(1)(C), the Defendant agrees to waive its right to grand jury indictment and its right to challenge venue in the United States District Court for the Eastern District of Michigan, and to plead guilty to Count One of the Sixth Superseding Information (the "Information").

    B.    **Count of Conviction**

    The Information charges the Defendant with one count of conspiracy to defraud the United States, to commit wire fraud, and to violate the Clean Air Act, in violation of Title 18, United States Code Section 371. The Defendant further agrees to persist in that plea through sentencing and, as set forth below, to cooperate fully with the Offices in their investigation into the conduct described in this Agreement and other conduct related to the introduction into the United States of diesel vehicles with defeat devices as defined under U.S. law.

2

C.    **Elements of Offense**

The Defendant understands that, to be guilty of this offense, the following essential elements of the offense must be satisfied:

Count One (Conspiracy)

1.    The elements for conspiracy to defraud the United States by obstructing the lawful function of the federal government are as follows:

    i.    That two or more persons conspired, or agreed, to defraud the United States or one of its agencies or departments, in this case, the Environmental Protection Agency (EPA), by dishonest means;

    ii.    That the defendant knowingly and voluntarily joined the conspiracy; and

    iii.    That a member of the conspiracy did one of the overt acts described in the Information for the purpose of advancing or helping the conspiracy.

2.    The elements for conspiracy to violate the wire fraud statute and Clean Air Act are as follows:

    i.    That two or more persons conspired, or agreed, to commit a crime, in this case, a violation of the wire fraud statute (18 U.S.C. § 1343) and the Clean Air Act (42 U.S.C. § 7413(c)(2)(A)) as described below;

3

ii.      That the defendant knowingly and voluntarily joined the conspiracy; and

iii.      That a member of the conspiracy did one of the overt acts described in the Information for the purpose of advancing or helping the conspiracy.

_Object of the Conspiracy – Wire Fraud – 18 U.S.C. § 1343_:

i.      The defendant knowingly participated in, devised, or intended to devise a scheme to defraud in order to obtain money or property for the Defendant or others;

ii.      The scheme included a material misrepresentation or concealment of a material fact;

iii.      The defendant had the intent to defraud; and

iv.      The defendant used (or caused another to use) wire, radio or television communications in interstate or foreign commerce in furtherance of the scheme.

_Object of the Conspiracy – Clean Air Act – 42 U.S.C. § 7413(c)(2)(A)_

i.      The defendant knowingly made (or caused to be made) a false material statement, representation, or certification, or omission of material information;

4

    ii.     The statement, representation or certification that was made (or omitted), or caused to be made or omitted, was in a notice, application, record, report, plan or other document required to be filed or maintained under the Clean Air Act; and

    iii.     The statement, representation, certification, or omission of information, was material.

### D. Statutory Maximum Penalties

The statutory maximum sentence that the Court can impose for a violation of Title 18, United States Code, Section 371 (Count One) is a fine of $500,000 or twice the gross pecuniary gain or gross pecuniary loss resulting from the offense, whichever is greatest, Title 18, United States Code, Section 3571(c), (d); five years' probation, Title 18, United States Code, Section 3561(c)(1); and a mandatory special assessment of $400, Title 18, United States Code, Section 3013(a)(2)(B).

### E. Factual Basis for Guilty Plea

The Defendant is pleading guilty because it is guilty of the charges contained in the Information. The Defendant admits, agrees, and stipulates that the factual allegations set forth in the Information and Exhibit 2 are true and correct, that it is responsible for the acts of its employees and agents described in the Information and Exhibit 2, and that the Information and Exhibit 2 accurately reflect the Defendant's

criminal conduct. The Defendant agrees that it will neither contest the admissibility of, nor contradict, the Statement of Facts contained in Exhibit 2 in any proceeding.

2.    **Sentencing Guidelines**

    A.    **Standard of Proof**

The Court will find sentencing factors by a preponderance of the evidence.

    B.    **Guideline Range**

The parties agree that pursuant to *United States v. Booker*, 543 U.S. 220 (2005), the Court must determine an advisory sentencing guideline range pursuant to the United States Sentencing Guidelines (U.S.S.G.). The Court will then determine a reasonable sentence within the statutory range after considering the advisory sentencing guideline range and the factors listed in Title 18, United States Code, Section 3553(a). The parties' agreement herein to any guideline sentencing factors constitutes proof of those factors sufficient to satisfy the applicable burden of proof. The Defendant also understands that if the Court accepts this Agreement, the Court is bound by the sentencing provisions in Paragraph 3.

The Offices and the Defendant agree that pursuant to U.S.S.G. § 8C2.2, no precise determination of the guideline fine range is required. While the Defendant would be entitled to a reduction for minor role, even with that reduction or others that might arguably apply, the Guidelines fine range would still be well beyond the Defendant's ability to pay. It is readily ascertainable that the Defendant cannot and

is not likely to become able (even on an installment schedule) to pay the minimum guideline fine.[1] The Offices and the Defendant agree that, pursuant to U.S.S.G. § 8C3.3(b), reducing the fine to $35,000,000.00 based on Defendant's inability to pay is not more than necessary to avoid substantially jeopardizing the continued viability of the Defendant.

3.    **Sentence**

Pursuant to Fed. R. Crim. P. 11(c)(1)(C), the Offices and the Defendant agree that the appropriate disposition of this case is as set forth in this Section and agree to recommend jointly that the Court impose it.

A.    **Relevant Considerations**

The Offices enter into this Agreement based on the individual facts and circumstances presented by this case and the Defendant, including:

1.    the nature and seriousness of the offense;

---

[1] Pursuant to U.S.S.G. § 8C2.4(a), the appropriate fine calculation in this case is based on the pecuniary loss according to the revenue from model year 2009-2014 Generation 1 Volkswagen vehicles. But even assuming, *arguendo*, that the fine table – which yields a lower amount than pecuniary loss – governs the fine calculation, the base fine is $72,500,000. *See* U.S.S.G. § 2B1.1 (yielding offense level 41); U.S.S.G. § 8C2.4(e)(1) (2017) (directing the use of the fine table from the November 1, 2014 Guidelines for offenses committed prior to November 1, 2015). Assuming, *arguendo*, a culpability score of 4, the fine range is $58,000,000-$116,000,000, and it is readily ascertainable that the defendant cannot and is not likely to become able to pay the minimum.

7

2.      the Defendant's relative culpability compared to its co-conspirators, including its minor role;

3.      the Defendant is continuing to enhance and improve its compliance program and internal controls;

4.      the Defendant has agreed, as part of its continuing cooperation obligations, and to ensure that the Defendant implements an effective compliance program, to the appointment of an independent monitor (the "Monitor") for a period of up to two years, who will have authority with respect to the Defendant;

5.      the Defendant has no prior criminal history;

6.      the Defendant has agreed to continue to cooperate with the Offices in any ongoing investigation of the conduct of the Defendant and its officers, directors, employees, agents, business partners, and consultants relating to the violations to which the Defendant is pleading guilty.

7.      the Defendant did not voluntarily and timely disclose to the Offices the conduct described in the Statement of Facts attached hereto as Exhibit 2 ("Statement of Facts"); and

8.      Volkswagen AG has already agreed to compensate members of the class in *In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation,* No. 3:15-md-2672 (N.D. Cal.), which consists of victims of the underlying criminal conduct that is the subject of this Agreement, and

to pay into a NOx remediation trust, in an aggregate amount of approximately $11 billion (based on then-net present value) pursuant to the Third Superseding Information (*see* D.E. 68).

B.      **Fine**

The Defendant shall pay to the United States a criminal fine of $35,000,000.00, payable in full within ten days of the entry of judgment following the sentencing hearing in this matter. The Defendant shall not seek or accept directly or indirectly reimbursement or indemnification from any source with regard to the penalty or disgorgement amounts that Defendant pays pursuant to the Agreement. The Defendant further agrees that it shall not claim, assert, or apply for, either directly or indirectly, any tax deduction, tax credit, or any other offset with regard to any U.S. federal, state, or local tax or taxable income for any fine or forfeiture paid pursuant to this Agreement.

C.      **Probation**

The parties agree that a term of organizational probation for a period of two years should be imposed on the Defendant pursuant to 18 U.S.C. §§ 3551(c)(1) and 3561(c)(1). The parties further agree, pursuant to U.S.S.G. § 8D1.4, that the term of probation shall include as conditions the obligations set forth in Paragraphs 5 and 6 below as well as the payment of the fine set forth in this Paragraph, but shall not include the obligations set forth in Paragraphs 7 and 15 below.

9

### D. Special Assessment

The Defendant shall pay to the Clerk of the Court for the United States District Court for the Eastern District of Michigan within ten days of the time of sentencing the mandatory special assessment of $400 per count.

### E. Restitution

No order of restitution is appropriate in this case pursuant to 18 U.S.C. § 3663A(c)(3), as the number of identifiable victims is so large as to make restitution impracticable and/or determining complex issues of fact related to the cause or amount of victims' losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process. Moreover, as noted in Paragraph 3(a)(8) above, Volkswagen AG has already agreed to compensate members of the class in *In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation*, No. 3:15-md-2672 (N.D. Cal.), including individuals who purchased affected vehicles.

### 4. Other Charges

In exchange for the guilty plea of the Defendant and the complete fulfillment of all of its obligations under this Agreement, the Offices agree they will not file additional criminal charges against the Defendant or any of its direct or indirect affiliates, subsidiaries, or joint ventures relating to: (a) any of the conduct described

10

in the Information or Exhibit 2; (b) any conduct related to the emissions, or compliance with U.S. emissions standards, of the Porsche Vehicles or the Subject Vehicles as defined in Exhibit 2 to the Volkswagen AG Plea Agreement to the Third Superseding Information (Dkt #68) ; and (c) any conduct disclosed by, or on behalf of, the Defendant or otherwise known to the Offices or the EPA as of the date of this Agreement. The Offices, however, may use any information related to the conduct described in Exhibit 2 to this Agreement against the Defendant: (a) in a prosecution for perjury or obstruction of justice apart from the charge in the Information and identified in Exhibit 2; (b) in a prosecution for making a false statement; (c) in a prosecution or other proceeding relating to any crime of violence; or (d) in a prosecution or other proceeding relating to a violation of any provision of Title 26 of the United States Code. This Paragraph does not provide any protection against prosecution for any other conduct, including but not limited to crimes made in the future by the Defendant or by any of its officers, directors, employees, agents or consultants, whether or not disclosed by the Defendant pursuant to the terms of this Agreement. This Agreement does not close or preclude the investigation or prosecution of any natural persons, including any officers, directors, employees, agents, or consultants of the Defendant or natural persons associated with its direct or indirect affiliates, subsidiaries, or joint ventures, who may have been involved in any of the matters set forth in the Information, Exhibit 2, or in any other matters.

11

The Defendant agrees that nothing in this Agreement is intended to release the Defendant from any and all of the Defendant's excise and income tax liabilities and reporting obligations for any and all income not properly reported and/or legally or illegally obtained or derived.

5.    **The Defendant's Obligations**

A.    Except as otherwise provided in Paragraph 6 below in connection with the Defendant's cooperation obligations, the Defendant's obligations under the Agreement shall last and be effective for a period beginning on the date on which the Information is filed and ending two years from the later of the date on which the Information is filed or the date on which the Monitor is retained by the Defendant, as described in paragraph 15 below (the "Term"). The Defendant agrees, however, that, in the event the Offices determine, in their sole discretion, that the Defendant has failed specifically to perform or to fulfill each of the Defendant's obligations under this Agreement, an extension or extensions of the Term may be imposed by the Offices, in their sole discretion, for up to a total additional time period of one year, without prejudice to the Offices' right to proceed as provided in Paragraph 9 below. Any extension of the Term extends all terms of this Agreement, including the terms of the Monitorship, for an equivalent period. Conversely, in the event the Offices find, in their sole discretion, that there exists a change in circumstances sufficient to eliminate the need for the Monitorship in Exhibit 3, and that the other

provisions of this Agreement have been satisfied, the Term may be terminated early, except for the Defendant's cooperation obligations described in Paragraph 6 below.

B.    The Defendant agrees to abide by all terms and obligations of this Agreement as described herein, including, but not limited to, the following:

1.    to plead guilty as set forth in this Agreement;

2.    to abide by all sentencing stipulations contained in this Agreement;

3.    to appear, through its duly appointed representatives, as ordered for all court appearances, and obey any other ongoing court order in this matter, consistent with all applicable U.S. and foreign laws, procedures, and regulations;

4.    to commit no further crimes;

5.    to be truthful at all times with the Court;

6.    to pay the applicable fine and special assessment;

7.    to continue to implement a compliance and ethics program designed to prevent and detect fraudulent conduct throughout its operations; and

8.    to cooperate with and report to the Offices as provided in Paragraph 6.

C.    The Defendant agrees that any fine or restitution imposed by the Court will be due and payable in full within ten days of the entry of judgment following the sentencing hearing, and the Defendant will not attempt to avoid or delay

13

payment. The Defendant further agrees to pay the Clerk of the Court for the United States District Court for the Eastern District of Michigan the mandatory special assessment of $400 per count within ten business days from the date of sentencing.

6.    **The Defendant's Cooperation and Reporting Obligations**

A.    The Defendant shall cooperate fully with the Offices in any and all matters relating to the conduct described in this Agreement and Exhibit 2 and other conduct under investigation by the Offices during the Term until the later of the date upon which all investigations and prosecutions arising out of such conduct are concluded, or the end of the Term. At the request of the Offices, the Defendant shall also cooperate fully with other domestic law enforcement and regulatory authorities and agencies in any investigation of the Defendant, its parent company or its affiliates, or any of its present or former officers, directors, employees, agents, and consultants, or any other party, in any and all matters relating to conduct described in this Agreement and Exhibit 2, and other conduct related to the Defendant's design, calibration, and/or installation of defeat devices and fraudulent representations pertaining thereto. The Defendant's cooperation pursuant to this Paragraph is subject to applicable law and regulations, as well as valid claims of attorney-client privilege or attorney work product doctrine; however, the Defendant must provide to the Offices timely notice of its intent to rely upon this provision along with a log of any information or cooperation that is withheld based on an

14

assertion of law, regulation, or privilege, and the Defendant bears the burden of establishing the validity of any such an assertion. The Defendant agrees that its cooperation pursuant to this paragraph shall include, but not be limited to, the following:

1.      The Defendant shall truthfully disclose all factual information with respect to its activities, those of Volkswagen AG and affiliates, and those of its present and former directors, officers, employees, agents, and consultants, including any evidence or allegations and internal or external investigations, about which the Defendant has any knowledge or about which the Offices may inquire. This obligation of truthful disclosure includes, but is not limited to, the obligation of the Defendant to provide to the Offices, upon request, any document, record or other tangible evidence about which the Offices may inquire of the Defendant.

2.      Upon request of the Offices, the Defendant shall designate knowledgeable employees, agents or attorneys to provide to the Offices the information and materials described in Paragraph 6(A)(1) above on behalf of the Defendant. It is further understood that the Defendant must at all times provide complete, truthful, and accurate information.

3.      The Defendant shall use its best efforts to make available for interviews or testimony, as requested by the Offices, present or former officers, directors, employees, agents and consultants of the Defendant. This obligation

includes, but is not limited to, sworn testimony before a federal grand jury or in federal trials, as well as interviews with domestic law enforcement and regulatory authorities. Cooperation under this Paragraph shall include identification of witnesses who, to the knowledge of the Defendant, may have material information regarding the matters under investigation.

4.     With respect to any information, testimony, documents, records or other tangible evidence provided to the Offices pursuant to this Agreement, the Defendant consents to any and all disclosures to other governmental authorities in the United States of such materials as the Offices, in their sole discretion, shall deem appropriate.

B.     In addition to the obligations in Paragraph 6(A), during the Term, should the Defendant learn of any evidence or allegation of a violation of U.S. federal law by or on behalf of the Defendant and relating to emissions of its customers' vehicles, false or misleading statements made to public authorities or regulators, fraud or misrepresentations in the sale or marketing of its or its customers' products, or obstruction of any pending or contemplated U.S. federal, state or local investigation or proceeding, the Defendant shall promptly report such evidence or allegation to the Offices. Thirty days prior to the end of the Term, the Defendant, by the Chief Executive Officer of the Defendant and the Chief Financial Officer of the Defendant, will certify to the Offices that the Defendant has met its

disclosure obligations pursuant to this Paragraph. Each certification will be deemed a material statement and representation by the Defendant to the executive branch of the United States for purposes of 18 U.S.C. § 1001, and it will be deemed to have been made in the judicial district in which this Agreement is filed.

7.    **Other Obligations**

A.    The Defendant agrees to retain an independent compliance monitor in accordance with Exhibit 3 of this Agreement.

B.    While the obligation set forth in this Paragraph is not a condition to the term of probation, any failure to comply with the obligation set forth in this Paragraph shall constitute a breach of this Agreement and be subject to the terms set forth in Paragraph 9 below.

8.    **Waiver of Appellate and Other Rights Under United States Law**

A.    The Defendant understands that by entering into this Agreement, the Defendant surrenders certain rights as provided in this Agreement. The Defendant understands that the rights of criminal defendants include the following:

1.    the right to plead not guilty and to persist in that plea;

2.    the right to a jury trial;

3.    the right to be represented by counsel – and if necessary have the court appoint counsel – at trial and at every other stage of the proceedings;

17

4.      the right at trial to confront and cross-examine adverse witnesses, to be protected from compelled self-incrimination, to testify and present evidence, and to compel the attendance of witnesses; and

5.      pursuant to Title 18, United States Code, Section 3742, the right to appeal the sentence imposed.

B.      Nonetheless, the Defendant knowingly waives the right to appeal or collaterally attack the conviction and any sentence within the statutory maximum described above in Paragraph 1(D) (or the manner in which that sentence was determined) on the grounds set forth in Title 18, United States Code, Section 3742, or on any ground whatsoever except those specifically excluded in this Paragraph, in exchange for the concessions made by the United States in this plea agreement. This Agreement does not affect the rights or obligations of the United States as set forth in Title 18, United States Code, Section 3742(b). The Defendant also knowingly waives the right to bring any collateral challenge of either the conviction, or the sentence imposed in this case. The Defendant hereby waives all rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including without limitation any records that may be sought under the Freedom of Information Act, Title 5, United States Code, Section 552, or the Privacy Act, Title 5, United States Code, Section 552a. The Defendant

waives all defenses based on the statute of limitations and venue with respect to any prosecution related to the conduct described in Exhibit 2 or the Information, including any prosecution that is not time-barred on the date that this Agreement is signed in the event that: (a) the conviction is later vacated for any reason; (b) the Defendant violates this Agreement; or (c) the plea is later withdrawn, provided such prosecution is brought within one year of any such vacation of conviction, violation of agreement, or withdrawal of plea plus the remaining time period of the statute of limitations as of the date that this Agreement is signed. The Offices are free to take any position on appeal or any other post-judgment matter. The parties agree that any challenge to the Defendant's sentence that is not foreclosed by this Paragraph will be limited to that portion of the sentencing calculation that is inconsistent with (or not addressed by) this waiver. Nothing in the foregoing waiver of appellate and collateral review rights shall preclude the Defendant from raising a claim of ineffective assistance of counsel in an appropriate forum.

C.    Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410 limit the admissibility of statements made in the course of plea proceedings or plea discussions in both civil and criminal proceedings, if the guilty plea is later withdrawn. The Defendant expressly warrants that it has discussed these rules with its counsel and understands them. Solely to the extent set forth below, the Defendant voluntarily waives and gives up the rights enumerated in Federal Rule of Criminal

Procedure 11(f) and Federal Rule of Evidence 410. Specifically, the Defendant understands and agrees that any statements that it makes in the course of its guilty plea or in connection with the Agreement are admissible against it for any purpose in any U.S. federal criminal proceeding if, even though the Offices have fulfilled all of their obligations under this Agreement and the Court has imposed the agreed-upon sentence, the Defendant nevertheless withdraws its guilty plea.

9. **Breach of Agreement**

A. If the Defendant (a) commits any felony under U.S. federal law; (b) provides in connection with this Agreement deliberately false, incomplete, or misleading information; (c) fails to cooperate as set forth in Paragraph 6 of this Agreement; (d) fails to implement a compliance program as set forth in Paragraph 3(A)(4) of this Agreement; (e) commits any acts that, had they occurred within the jurisdictional reach of the conspiracy statute, 18 U.S.C. § 371, wire fraud statute, 18 U.S.C. § 1343, or the Clean Air Act, 42 U.S.C. § 7413(c)(2)(A), would be a violation of the conspiracy, wire fraud, or Clean Air Act statutes; or (f) otherwise fails specifically to perform or to fulfill completely each of the Defendant's obligations under the Agreement, regardless of whether the Offices become aware of such a breach after the Term of the Agreement, the Defendant shall thereafter be subject to prosecution for any federal criminal violation of which the Offices have knowledge, including, but not limited to, the charges in the Information described in Paragraph

1, which may be pursued by the Offices in the U.S. District Court for the Eastern District of Michigan or any other appropriate venue. Determination of whether the Defendant has breached the Agreement and whether to pursue prosecution of the Defendant shall be in the Offices' sole discretion.  Any such prosecution may be premised on information provided by the Defendant. Any such prosecution relating to the conduct described in the attached Exhibit 2 or relating to conduct known to the Offices prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against the Defendant, notwithstanding the expiration of the statute of limitations, between the signing of this Agreement and the expiration of the Term of the Agreement plus one year. Thus, by signing this Agreement, the Defendant agrees that the statute of limitations with respect to any such prosecution that is not time-barred on the date of the signing of this Agreement shall be tolled for the Term of the Agreement plus one year. The Defendant gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such prosecution or action, except to the extent that such defenses existed as of the date of the signing of this Agreement. In addition, the Defendant agrees that the statute of limitations as to any violation of federal law that occurs during the term of the cooperation obligations provided for in Paragraph 6 of the Agreement will be tolled from the date upon which the

violation occurs until the earlier of the date upon which the Offices are made aware of the violation or the duration of the term plus five years, and that this period shall be excluded from any calculation of time for purposes of the application of the statute of limitations.

B.     In the event the Offices determine that the Defendant has breached this Agreement, the Offices agree to provide the Defendant with written notice of such breach prior to instituting any prosecution resulting from such breach. Within thirty days of receipt of such notice, the Defendant shall have the opportunity to respond to the Offices in writing to explain the nature and circumstances of such breach, as well as the actions the Defendant has taken to address and remediate the situation, which explanation the Offices shall consider in determining whether to pursue prosecution of the Defendant.

C.     In the event that the Offices determine that the Defendant has breached this Agreement: (a) all statements made by or on behalf of the Defendant to the Offices or to the Court, including the attached Exhibit 2, and any testimony given by the Defendant before a grand jury, a court, or any tribunal, or at any legislative hearings, whether prior or subsequent to this Agreement, and any leads derived from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings brought by the Offices against the Defendant; and (b) the Defendant shall not assert any claim under the United States Constitution, Rule 11(f) of the

22

Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that any such statements or testimony made by or on behalf of the Defendant prior or subsequent to this Agreement, or any leads derived therefrom, should be suppressed or are otherwise inadmissible. The decision whether conduct or statements of any current director, officer or employee, or any person acting on behalf of, or at the direction of, the Defendant, will be imputed to the Defendant for the purpose of determining whether the Defendant has violated any provision of this Agreement shall be in the sole discretion of the Offices.

     D.    The Defendant acknowledges that the Offices have made no representations, assurances, or promises concerning what sentence may be imposed by the Court if the Defendant breaches this Agreement and this matter proceeds to judgment. The Defendant further acknowledges that any such sentence is solely within the discretion of the Court and that nothing in this Agreement binds or restricts the Court in the exercise of such discretion.

10.   **Parties to the Plea Agreement**

     The Defendant understands and agrees that this Agreement is between the Offices and the Defendant and does not bind any other division or section of the Department of Justice or any other federal, state, or local prosecuting, administrative, or regulatory authority. Nevertheless, the Offices will bring this Agreement and the nature and quality of the conduct, cooperation and remediation

of the Defendant, its direct or indirect affiliates, subsidiaries, and joint ventures, to the attention of other prosecuting authorities or other agencies, as well as debarment authorities, if requested by the Defendant.

The Defendant agrees that this Agreement will be executed by an authorized corporate representative. The Defendant further agrees that such execution is authorized by the Defendant's Management Board, with consent of the Supervisory Board and the Shareholders Meeting, as further represented in Exhibit 1 in the Defendant's Corporate Officer Certificate, and that the Corporate Officer is fully authorized to enter into this Agreement and take all necessary steps to effectuate this Agreement, and that the signatures on this Agreement by the Defendant and its counsel are authorized by the Defendant's Management Board, with the consent of the Supervisory Board and the Shareholders Meeting, on behalf of the Defendant.

The Defendant agrees that it has the full legal right, power, and authority to enter into and perform all of its obligations under this Agreement.

## 11. Change in Corporate Form

Except as may otherwise be agreed by the parties in connection with a particular transaction, the Defendant agrees that in the event that, during the Term of the Agreement, the Defendant undertakes any change in corporate form, including if it sells, merges, or transfers business operations that are material to the Company's consolidated operations, or to the operations of any subsidiaries or affiliates involved

in the conduct described in Exhibit 2 of the Agreement attached hereto, as they exist as of the date of this Agreement, whether such sale is structured as a sale, asset sale, merger, transfer, or other change in corporate form, it shall include in any contract for sale, merger, transfer, or other change in corporate form a provision binding the purchaser, or any successor in interest thereto, to the obligations described in this Agreement. The purchaser or successor in interest must also agree in writing that the Offices' ability to breach under this Agreement is applicable in full force to that entity. The Defendant agrees that the failure to include these provisions in the transaction will make any such transaction null and void. The Defendant shall provide notice to the Offices at least thirty days prior to undertaking any such sale, merger, transfer, or other change in corporate form. The Offices shall notify the Defendant prior to such transaction (or series of transactions) if they determine that the transaction(s) will have the effect of circumventing or frustrating the enforcement purposes of this Agreement. If at any time during the Term the Defendant engages in a transaction(s) that has the effect of circumventing or frustrating the enforcement purposes of this Agreement, the Offices may deem it a breach of this Agreement pursuant to Paragraph 9 of this Agreement. Nothing herein shall restrict the Defendant from indemnifying (or otherwise holding harmless) the purchaser or successor in interest for penalties or other costs arising from any conduct that may have occurred prior to the date of the transaction, so long as such

indemnification does not have the effect of circumventing or frustrating the enforcement purposes of this Agreement, as determined by the Offices.

12.    **Failure of Court to Accept Agreement**

This Agreement is presented to the Court pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C). The Defendant understands that, if the Court rejects this Agreement, the Court must: (a) inform the parties that the Court rejects the Agreement; (b) advise the Defendant's counsel that the Court is not required to follow the Agreement and afford the Defendant the opportunity to withdraw its plea; and (c) advise the Defendant that if the plea is not withdrawn, the Court may dispose of the case less favorably toward the Defendant than the Agreement contemplated. The Defendant further understands that if the Court refuses to accept any provision of this Agreement, neither party shall be bound by the provisions of the Agreement.

13.    **Presentence Report**

The Defendant and the Offices waive the preparation of a Presentence Investigation Report. The Defendant understands that the decision whether to proceed with the sentencing without a Presentence Investigation Report is exclusively that of the Court. In the event the Court directs the preparation of a Presentence Investigation Report, the Offices will fully inform the preparer of the Presentence Investigation Report and the Court of the facts and law related to the Defendant's case. At the time of the plea hearing, the parties will suggest mutually

agreeable and convenient dates for the sentencing hearing with adequate time for (a) any objections to the Presentence Report, and (b) consideration by the Court of the Presentence Report and the parties' sentencing submissions.

14.   **Public Statement by the Defendant**

     A.    The Defendant expressly agrees that it shall not, through present or future attorneys, officers, directors, employees, agents or any other person authorized to speak for the Defendant make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by the Defendant set forth above or the facts described in the Information and Exhibit 2. Any such contradictory statement shall, subject to cure rights of the Defendant described below, constitute a breach of this Agreement, and the Defendant thereafter shall be subject to prosecution as set forth in Paragraph 9 of this Agreement. The decision whether any public statement by any such person contradicting a fact contained in the Information or Exhibit 2 will be imputed to the Defendant for the purpose of determining whether it has breached this Agreement shall be at the sole discretion of the Offices. If the Offices determine that a public statement by any such person contradicts in whole or in part a statement contained in the Information or Exhibit 2, the Offices shall so notify the Defendant, and the Defendant may avoid a breach of this Agreement by publicly repudiating such statement(s) within five business days after notification. The Defendant shall be permitted to raise defenses and to assert affirmative claims

in other proceedings relating to the matters set forth in the Information and Exhibit 2 provided that such defenses and claims do not contradict, in whole or in part, a statement contained in the Information or Exhibit 2. This Paragraph does not apply to any statement made by any present or former officer, director, employee, or agent of the Defendant in the course of any criminal, regulatory, or civil case initiated against such individual, unless such individual is speaking on behalf of the Defendant.

B.      The Defendant agrees that if it or any of its direct or indirect subsidiaries or affiliates issues a press release or holds any press conference in connection with this Agreement, the Defendant shall first consult the Offices to determine (a) whether the text of the release or proposed statements at the press conference are true and accurate with respect to matters between the Offices and the Defendant; and (b) whether the Offices have any objection to the release or statement.

15.   **Independent Compliance Monitor**

A.      Promptly after the Offices' selection pursuant to Paragraph 15(B) below, the Defendant agrees to retain the Monitor for the term specified in Paragraph 15(C). The Monitor's duties and authority, and the obligations of the Defendant with respect to the Monitor and the Offices, are set forth in Exhibit 3, which is incorporated by reference into this Agreement. Within twenty business

days after the date of execution of this Agreement, and after consultation with the Offices, the Defendant will propose to the Offices a pool of three qualified candidates to serve as the Monitor. If the Offices determine, in their sole discretion, that any of the candidates are not, in fact, qualified to serve as the Monitor, or if the Offices, in their sole discretion, are not satisfied with the candidates proposed, the Offices reserve the right to seek additional nominations from the Defendant. The parties will endeavor to complete the monitor selection process within sixty days of the execution of this Agreement. The Monitor candidates or their team members shall have, at a minimum, the following qualifications:

1.    demonstrated expertise with respect to federal anti-fraud and environmental laws, including experience counseling on these issues;

2.    experience designing and/or reviewing corporate ethics and compliance programs, including anti-fraud policies, procedures and internal controls;

3.    knowledge of automotive or similar industries;

4.    the ability to access and deploy resources as necessary to discharge the Monitor's duties as described in the Agreement; and

5.    sufficient independence from the Defendant to ensure effective and impartial performance of the Monitor's duties as described in the Agreement.

B.     The Offices retain the right, in their sole discretion, to choose the Monitor from among the candidates proposed by the Defendant, though the Defendant may express its preference(s) among the candidates. In the event the Offices reject all proposed Monitors, the Defendant shall propose an additional three candidates within twenty business days after receiving notice of the rejection. This process shall continue until a Monitor acceptable to both parties is chosen. The Offices and the Defendant will use their best efforts to complete the selection process within sixty calendar days of the execution of this Agreement. If, during the term of the monitorship, the Monitor becomes unable to perform his or her obligations as set out herein and in Exhibit 3, or if the Offices in their sole discretion determine that the Monitor cannot fulfill such obligations to the satisfaction of the Offices, the Offices shall notify the Defendant of the release of the Monitor, and the Defendant shall within thirty calendar days of such notice recommend a pool of three qualified Monitor candidates from which the Offices will choose a replacement.

C.     The Monitor's term shall be two years from the date on which the Monitor is retained by the Defendant, subject to extension or early termination as described in Paragraph 5. The Monitor's powers, duties, and responsibilities, as well as additional circumstances that may support an extension of the Monitor's term, are set forth in Exhibit 3. The Defendant agrees that it will not employ or be affiliated with the Monitor or the Monitor's firm for a period of not less than two years from

the date on which the Monitor's term expires. Nor will the Defendant discuss with the Monitor or the Monitor's firm the possibility of further employment or affiliation during the Monitor's term.

16. **Complete Agreement**

This document states the full extent of the Agreement between the parties. There are no other promises or agreements, express or implied. Any modification of this Agreement shall be valid only if set forth in writing in a supplemental or revised plea agreement signed by all parties.

**AGREED:**

**FOR IAV GmbH:**

Date: _17 December 2018_      By: _____

                                      Kai-Stefan Linnenkohl
                                      Member, Management Board
                                      IAV GmbH Ingenieurgesellschaft Auto
                                      und Verkehr

Date: _17 December 2018_      By: _____

                                        Ronald J. Tenpas
                                      Vinson & Elkins LLP
                                      Outside counsel for IAV GmbH
                                      Ingenieurgesellschaft Auto und Verkehr

**FOR THE DEPARTMENT OF JUSTICE:**

                                      SANDRA MOSER
                                      Acting Chief, Fraud Section
                                      Criminal Division

Date: _12/17/2018_      By: _____

                                      Philip Trout
                                      Mark Cipolletti
                                      Trial Attorneys

                                      JEAN E. WILLIAMS
                                      Deputy Assistant Attorney General
                                      Environment and Natural Resources
                                      Division

Date: 12-18-18

By: _____
Jennifer L. Blackwell
Senior Trial Attorney

MATTHEW J. SCHNEIDER
United States Attorney Eastern District
of Michigan

Date: 12-18-18

By: _____
John K. Neal
Chief, White Collar Crime Unit

**EXHIBIT 1**

**COMPANY OFFICER'S CERTIFICATE AND**
**CERTIFICATE OF COUNSEL**

Copies of the executed Company Officer's Certificate and Certificate of

Counsel are annexed hereto as "Exhibit 1."

COMPANY OFFICER'S CERTIFICATE

I have read the plea agreement between IAV GmbH Ingenieurgesellschaft Auto und Verkehr (the "Defendant") and the United States of America, by and through the Department of Justice, Criminal Division, Fraud Section, the United States Attorney's Office for the Eastern District of Michigan, and the Department of Justice, Environment and Natural Resources Division, Environmental Crimes Section (the "Agreement") and carefully reviewed every part of it with outside counsel for the Defendant. I understand the terms of the Agreement and voluntarily agree, on behalf of the Defendant, to each of its terms. Before signing the Agreement, I consulted outside counsel for the Defendant. Counsel fully advised me of the rights of the Defendant, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into this Agreement.

I have carefully reviewed the terms of the Agreement with the Management Board, the Supervisory Board and the Shareholder Meeting. I have caused outside counsel for the Defendant to advise the Management Board, the Supervisory Board and the Shareholder Meeting fully of the rights of the Defendant, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into the Agreement.

Exh. 1-2

No promises or inducements have been made other than those contained in the Agreement. Furthermore, no one has threatened or forced me, or to my knowledge any person authorizing the Agreement on behalf of the Defendant, in any way to enter into the Agreement. I am also satisfied with outside counsel's representation in this matter. I certify that I am a member of the Management Board and that I have been duly authorized by the Defendant to execute the Agreement on behalf of the Defendant.

Date: *17 December 2018*

IAV GmbH Ingenieurgesellschaft Auto und Verkehr

By: _____

Kai-Stefan Linnenkohl
Member, Management Board

Exh. 1-3

## CERTIFICATE OF COUNSEL

I am counsel for IAV GmbH Ingenieurgesellschaft Auto and Verkehr (the

"Defendant") in the matter covered by the plea agreement between the Defendant

and the United States of America, by and through the Department of Justice,

Criminal Division, Fraud Section, the United States Attorney's Office for the

Eastern District of Michigan, and the Department of Justice, Environment and

Natural Resources Division, Environmental Crimes Section (the "Agreement").  In

connection with such representation, I have examined relevant documents and have

discussed, or caused to be discussed by counsel, the terms of the Agreement with

the Management Board, the Supervisory Board and the Shareholders Meeting.

Based on my review of the foregoing materials and discussion, I am of the opinion

that the representative of the Defendant has been duly authorized to enter into the

Agreement on behalf of the Defendant and that the Agreement has been duly and

validly authorized, executed and delivered on behalf of the Defendant and is a

valid and binding obligation of the Defendant.  Further, I have carefully reviewed,

or caused to be reviewed by counsel, the terms of the Agreement with the

Management Board, the Supervisory Board and the Shareholders Meeting of the

Defendant.  I have fully advised them, or caused them to be advised, of the rights

of the Defendant, of possible defenses, of the Sentencing Guidelines' provisions

Exh. 1-4

and of the consequences of entering into the Agreement.  To my knowledge, the

decision of the Defendant to enter into the Agreement, with the consent of the

Supervisory Board and Shareholders Meeting, is an informed and voluntary one.

Dated: *17 December 2018*

By: _____

Ronald J. Tenpas
Vinson & Elkins, LLP
Counsel for IAV GmbH
Ingenieurgesellschaft
Auto and Verkehr

Exh. 1-5

**EXHIBIT 2**

**STATEMENT OF FACTS**

The following Statement of Facts is incorporated by reference as part of the Plea Agreement between the United States Department of Justice (the "Department") and IAV GmbH ("IAV" or the "Company"), and the parties hereby agree and stipulate that the following information is true and accurate. IAV admits, accepts, and acknowledges that it is responsible for the acts of its employees and agents as set forth below. All references to legal terms and emissions standards, to the extent contained herein, should be understood to refer exclusively to applicable U.S. laws and regulations, and such legal terms contained in this Statement of Facts are not intended to apply to, or affect, IAV's rights or obligations under the laws or regulations of any jurisdiction outside the United States. This Statement of Facts does not contain all of the facts known to the Department or IAV; the Department's investigation into individuals is ongoing. Had this matter proceeded to trial, IAV acknowledges that the Department would have proven beyond a reasonable doubt, by admissible evidence, the facts alleged below and set forth in the Sixth Superseding Information:

## Relevant Entities

1. From at least in or about 2006 until the present, defendant IAV was an automotive engineering company based in Berlin, Germany, which specialized in software, electronics, and technology support for vehicle manufacturers.

2. Volkswagen AG ("VW AG") was a motor vehicle manufacturer based in Wolfsburg, Germany. VW AG owned fifty percent of IAV's shares and was IAV's largest customer.

3. Volkswagen Group of America, Inc. ("VW GOA") was a wholly-owned subsidiary of VW AG based in Herndon, Virginia.

4. VW AG and its affiliates and subsidiaries, including Audi AG, are collectively referred to herein as "VW."

## U.S. NOx Emissions Standards

5. The purpose of the Clean Air Act and its implementing regulations was to protect human health and the environment by, among other things, reducing emissions of pollutants from new motor vehicles, including nitrogen oxides ("NOx").

6. The Clean Air Act required the U.S. Environmental Protection Agency ("EPA") to promulgate emissions standards for new motor vehicles. The EPA

established standards and test procedures for light-duty motor vehicles, including emission standards for NOx.

7.    The Clean Air Act prohibited manufacturers of new motor vehicles and new motor vehicle engines from selling, offering for sale, or introducing into commerce, or importing (or causing the foregoing with respect to) any new motor vehicle unless the vehicle or engine complied with emissions standards, including NOx emissions standards, and was issued an EPA certificate of conformity as required by the Clean Air Act and federal regulations implementing the Clean Air Act.

8.    To obtain a certificate of conformity, a manufacturer was required to submit an application to the EPA for each model year and for each test group of vehicles that it intended to sell in the United States. The application was required to be in writing, to be signed by an authorized representative of the manufacturer, and to include, among other things, the results of testing done pursuant to the published Federal Test Procedures that measure NOx emissions, and a description of the engine, emissions control system, and fuel system components, including a detailed description of each Auxiliary Emission Control Device ("AECD") to be installed on the vehicle.

9. An AECD was defined as "any element of design which senses temperature, vehicle speed, engine RPM, transmission gear, manifold vacuum, or any other parameter for the purpose of activating, modulating, delaying, or deactivating the operation of any part of the emission control system." The manufacturer was also required to include a justification for each AECD. If the EPA, in reviewing the application for a certificate of conformity, determined that the AECD "reduced the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use," and that (1) it was not substantially included in the Federal Test Procedure, (2) the need for the AECD was not justified for protection of the vehicle against damage or accident, or (3) it went beyond the requirements of engine starting, the AECD was considered a "defeat device."

10. The EPA would not certify motor vehicles equipped with defeat devices. Manufacturers could not sell motor vehicles in the United States without a certificate of conformity from the EPA.

11. The California Air Resources Board ("CARB") (together with the EPA, "U.S. regulators") issued its own certificates, called executive orders, for the sale of motor vehicles in the State of California. To obtain such a certificate, the

manufacturer was required to satisfy the standards set forth by the State of California, which were equal to or more stringent than those of the EPA.

12. As part of the application for a certification process, manufacturers often worked in parallel with the EPA and CARB. To obtain a certificate of conformity from the EPA, manufacturers were also required to demonstrate that the light-duty vehicles were equipped with an on-board diagnostic ("OBD") system capable of monitoring all emissions-related systems or components. Manufacturers could demonstrate compliance with California OBD standards in order to meet federal requirements. CARB reviewed applications from manufacturers to determine whether their OBD systems were in compliance with California OBD standards, and CARB's conclusion would be included in the application the manufacturer submitted to the EPA.

13. In 1998, the United States established new federal emissions standards that would be implemented in separate steps, or Tiers. Tier II emissions standards, including for NOx emissions, were significantly stricter than Tier I. For light-duty vehicles, the regulations required manufacturers to begin to phase in compliance with the new, stricter Tier II NOx emissions standards in 2004 and required manufacturers to fully comply with the stricter standards for model year 2007.

**VW Diesel Vehicles Sold in the United States**

14. VW sold, offered for sale, introduced into commerce, delivered for introduction into commerce, imported into the United States, or caused the foregoing actions (collectively, "sold in the United States") the following vehicles containing 2.0 liter diesel engines ("Subject Vehicles"):

    a.    Model Year ("MY") 2009-2015 VW Jetta;

    b.    MY 2009-2014 VW Jetta Sportwagen;

    c.    MY 2010-2015 VW Golf;

    d.    MY 2015 VW Golf Sportwagen;

    e.    MY 2010-2013 Audi A3, MY 2015 Audi A3;

    f.    MY 2013-2015 VW Beetle and VW Beetle Convertible; and

    g.    MY 2012-2015 VW Passat.

15. VW GOA's Engineering and Environmental Office ("EEO") was located in Auburn Hills, Michigan, in the Eastern District of Michigan. Among other things, EEO prepared and submitted applications (the "Applications") for a certificate of conformity and an executive order (collectively, "Certificates") to the EPA and CARB to obtain authorization to sell each of the Subject Vehicles in the United States. VW GOA's Test Center California performed testing related to the Subject Vehicles.

Exh. 2-6

16.   The Applications to the EPA were accompanied by the following signed statement by a VW representative:

> The Volkswagen Group states that any element of design, system, or emission control device installed on or incorporated in the Volkswagen Group's new motor vehicles or new motor vehicle engines for the purpose of complying with standards prescribed under section 202 of the Clean Air Act, will not, to the best of the Volkswagen Group's information and belief, cause the emission into the ambient air of pollutants in the operation of its motor vehicles or motor vehicle engines which cause or contribute to an unreasonable risk to public health or welfare except as specifically permitted by the standards prescribed under section 202 of the Clean Air Act. The Volkswagen Group further states that any element of design, system, or emission control device installed or incorporated in the Volkswagen Group's new motor vehicles or new motor vehicle engines, for the purpose of complying with standards prescribed under section 202 of the Clean Air Act, will not, to the best of the Volkswagen Group's information and belief, cause or contribute to an unreasonable risk to public safety.
>
> . . .
>
> All vehicles have been tested in accordance with good engineering practice to ascertain that such test vehicles meet the requirement of this section for the useful life of the vehicle.

17.   Based on the representations made by VW employees in the Applications for the Subject Vehicles, EPA and CARB issued Certificates for these vehicles, allowing the Subject Vehicles to be sold in the United States.

18.   VW represented to its U.S. customers, U.S. dealers, U.S. regulators and others, that the Subject Vehicles met the new and stricter U.S. emissions standards identified in paragraph 13 above.   Further, VW designed a specific marketing campaign to market these vehicles to U.S. customers as "clean diesel" vehicles.

### IAV's Criminal Conduct

19.   From at least in or about May 2006 until in or about November 2015, IAV and its co-conspirators, including VW, worked on the design and calibration of engine control units containing defeat devices and agreed to defraud U.S. regulators and U.S. customers, and violate the Clean Air Act, by misleading U.S. regulators and U.S. customers about whether the EA 189 2.0 liter diesel engine vehicles for MY 2009-2014 (collectively, the "Gen 1 Vehicles") complied with U.S. emissions standards.   During their involvement with the design of the Gen 1 Vehicles in the United States, IAV and its co-conspirators: (a) knew that the Gen 1 Vehicles did not meet U.S. emissions standards; (b) worked collaboratively in designing, testing, implementing, and improving software they knew that VW was using to cheat the U.S. testing process by making it appear as if the Gen 1 Vehicles met U.S. emissions standards when, in fact, they did not; and (c) was aware that VW attempted to and did conceal these facts from U.S. regulators and U.S. consumers.

*The Origin and Implementation of the 2.0 Liter Defeat Device*

20.   In at least in or about 2006, VW employees working under supervisors within and of VW's Brand Engine Development department (the "VW supervisors"), were designing the new EA 189 2.0 liter diesel engine that would be the cornerstone of a new project to sell passenger diesel vehicles in the United States. Selling diesel vehicles in the U.S. market was an important strategic goal of VW AG.  This project became known within VW as the "US'07" project.

21.   The VW supervisors, however, realized that they could not design a diesel engine that would both meet the stricter NOx emissions standards that would become effective in 2007 and attract sufficient customer demand in the U.S. market. Instead of bringing to market a diesel vehicle that could legitimately meet the stricter U.S. NOx emissions standards, IAV employees acting at the direction of an IAV manager and the VW supervisors helped design, create, and implement a software function (the "defeat device") to cheat the standard U.S. emissions tests.  IAV, the VW supervisors and their co-conspirators referred to the software as, among other things, the "acoustic function," "switch logic," "cycle beating," or "emissions-tight mode."

22.   VW delegated certain tasks associated with designing the EA 189 engine to IAV, including parts of software development, diesel development, and

exhaust aftertreatment. IAV engineers worked closely with their counterparts at VW on various technical aspects of the design for the EA 189 engine, and met frequently at IAV's and VW's facilities regarding a variety of technical issues related to the EA 189 engine design.

23. In or about November 2006, a VW employee requested that an IAV employee assist in the design of defeat device software for use in the EA 189 engine. The IAV engineer in the Powertrain Mechatronik division, which is the division responsible for functional development, agreed to do so.

24. On or about November 10, 2006, the IAV employee, on behalf of and at the direction of VW, prepared documentation for a software design change to what was known as the "acoustic function" that would become the defeat device.

25. On or about February 5 and 6, 2007, IAV and VW engineers held a two-day meeting to address technical problems with meeting U.S. emissions limits in the EA 189 engine. During the meeting, the participants discussed whether they could overcome these technical problems and produce an engine that complied with U.S. emissions limits.

26. In or about 2006 and 2007, IAV engineers and VW engineers traveled to VW's test facility in Westlake, California, and to other locations in the United States, to conduct test drives on vehicles with the EA 189 engine, and more

specifically to evaluate whether the defeat device software was operating properly. During one such trip, an IAV engineer in the United States emailed a VW manager in Germany to report on problems with the software.

27.  No later than 2008, an IAV manager knew the purpose of the defeat device software and instructed IAV employees to continue working on the project. In 2008, IAV employees presented the IAV manager with a detailed summary of the defeat device software.  The IAV manager used that presentation in a meeting with a VW manager to discuss the use of the defeat device software.  The VW manager approved the use of the defeat device software, and the IAV manager thereafter directed IAV employees to route VW's requests regarding the defeat device software through him and was involved in coordinating IAV's continued work on it.

28.  IAV employees, acting at the direction of the IAV manager and VW supervisors, helped design and implement the defeat device software. IAV, the VW supervisors, and their co-conspirators knew that U.S. regulators would measure VW's diesel vehicles' emissions through standard tests with specific, published drive cycles.  IAV employees and VW employees, all acting at the direction of the VW supervisors and their co-conspirators, designed the VW defeat device to recognize whether the vehicle was undergoing standard U.S. emissions testing on a dynamometer (or "dyno") or whether the vehicle was being driven on the road under

normal driving conditions.  The defeat device accomplished this by recognizing the standard drive cycles used by U.S. regulators.  If the vehicle's software detected that it was being tested, the vehicle performed in one mode, which satisfied U.S. NOx emissions standards.  If the vehicle's software detected that the vehicle was not being tested, it operated in a different mode, in which the effectiveness of the vehicle's emissions control systems was reduced substantially, causing the vehicle to emit substantially higher NOx, sometimes 35 times higher than U.S. standards.

### Certification of VW Diesel Vehicles in the United States

29.  As part of the certification process for each new model year, defendant IAV and its co-conspirators, including the VW supervisors and other VW management officials and employees, falsely and fraudulently certified, and/or caused to be certified, to the EPA and CARB that the Gen 1 Vehicles met U.S. emissions standards and complied with standards prescribed by the Clean Air Act. IAV knew that VW was required to obtain these certifications in order to sell the Gen 1 Vehicles in the United States.  Furthermore, IAV and its co-conspirators knew that if they had told the truth and disclosed the existence of the defeat device, VW would not have obtained the requisite Certificates for the Gen 1 Vehicles and could not have sold any of them in the United States.

Exh. 2-12

30. On or about October 31, 2013, IAV's co-conspirator, VW, through VW GOA's EEO office in Auburn Hills, Michigan, submitted the final application to EPA for Certification of the Model Year 2013 VW Jetta, Jetta Sportwagen, Golf, Beetle, and Beetle Convertible vehicles.

### Marketing of "Clean Diesel" Vehicles

31. Having obtained the necessary EPA and CARB Certificates, IAV's co-conspirators, including VW supervisors and other VW management officials and employees, marketed, and/or caused to be marketed, the Gen 1 Vehicles to the U.S. public as "clean diesel" and environmentally-friendly, when they knew that these representations made to U.S. customers were false, that the Gen 1 Vehicles were not "clean," and that the Gen 1 Vehicles were intentionally designed to detect, evade, and defeat U.S. emissions standards, and that the Gen 1 Vehicles were polluting the environment with NOx emissions well above U.S. emission limits.

32. As a result of the conspiracy, IAV and its co-conspirators caused defeat device software to be installed on all of the approximately 335,000 Gen 1 Vehicles sold in the United States from 2009 through 2014.

## EXHIBIT 3

## INDEPENDENT COMPLIANCE MONITOR

The duties and authority of the Independent Compliance Monitor (the "Monitor"), and the obligations of IAV GmbH, on behalf of itself and its subsidiaries and affiliates (for purposes of this Exhibit 3, the "Defendant" or "Company"), with respect to the Monitor and the United States Department of Justice, Criminal Division, Fraud Section, the United States Attorney's Office for the Eastern District of Michigan, and the United States Department of Justice, Environment and Natural Resources Division, Environmental Crimes Section (collectively hereafter, "the Offices"), are as described below.

1.     The Company will retain the Monitor for a period of two years (the "Term of the Monitorship"), unless the early termination provision of Paragraph 5(A) of the Plea Agreement (the "Agreement") is triggered.

### Monitor's Mandate

2.     The Monitor's responsibility is to assess, oversee, and monitor the Company's compliance with the terms of the Agreement, so as to specifically address and reduce the risk of any recurrence of the Company's misconduct. During the Term of the Monitorship, the Monitor will evaluate, in the manner set forth below, the Company's implementation and enforcement of its compliance and ethics program for the purpose of preventing future criminal fraud and environmental

Exh. 3-1

violations by the Company and its affiliates, including, but not limited to, violations related to the conduct giving rise to the Sixth Superseding Information filed in this matter, and will take such reasonable steps as, in his or her view, may be necessary to fulfill the foregoing mandate (the "Mandate"). This Mandate shall include an assessment of the Management Board's and senior management's commitment to, and effective implementation of, the Company's corporate compliance and ethics program.

*Company's Obligations*

3.     The Company shall cooperate fully with the Monitor, and the Monitor shall have the authority to take such reasonable steps as, in his or her view, may be necessary to be fully informed about the Company's ethics and compliance program in accordance with the principles set forth herein and applicable law, including applicable environmental, data protection, and labor laws and regulations. To that end, the Company shall:   facilitate the Monitor's access to the Company's documents and resources; not limit such access, except as provided in Paragraphs 5-6; and provide guidance on applicable local law (such as relevant data protection and labor laws). The Company shall provide the Monitor with access to all information, documents, records, facilities, and employees, as reasonably requested by the Monitor, that fall within the scope of the Mandate of the Monitor under the

Exh. 3-2

Agreement. The Company shall use its best efforts to provide the Monitor with access to the Company's former employees and its third-party vendors, agents, and consultants.

4.     Any disclosure by the Company to the Monitor concerning fraudulent conduct shall not relieve the Company of any otherwise applicable obligation to truthfully disclose such matters to the Offices, pursuant to the Agreement.

*Withholding Access*

5.     The parties agree that no attorney-client relationship shall be formed between the Company and the Monitor. In the event that the Company seeks to withhold from the Monitor access to information, documents, records, facilities, or current or former employees of the Company that may be subject to a claim of attorney-client privilege or to the attorney work-product doctrine, or where the Company reasonably believes production would otherwise be inconsistent with applicable law, the Company shall work cooperatively with the Monitor to resolve the matter to the satisfaction of the Monitor consistent with applicable law.

6.     If the matter cannot be resolved, at the request of the Monitor, the Company shall promptly provide written notice to the Monitor and the Offices. Such notice shall include a general description of the nature of the information, documents, records, facilities or current or former employees that are being

withheld, as well as the legal basis for withholding access. The Offices may then consider whether to make a further request for access to such information, documents, records, facilities, or employees.

*Monitor's Coordination with the Company and Review Methodology*

7.    In carrying out the Mandate, to the extent appropriate under the circumstances, the Monitor should coordinate with Company personnel, including in-house counsel, compliance personnel, and internal auditors, on an ongoing basis. The Monitor may rely on the product of the Company's processes, such as the results of studies, reviews, sampling and testing methodologies, audits, and analyses conducted by or on behalf of the Company, as well as the Company's internal resources (e.g., legal, compliance, and internal audit), which can assist the Monitor in carrying out the Mandate through increased efficiency and Company-specific expertise, provided that the Monitor has confidence in the quality of those resources.

8.    The Monitor's reviews should use a risk-based approach, and thus, the Monitor is not expected to conduct a comprehensive review of all business lines, all business activities, or all markets. In carrying out the Mandate, the Monitor should consider, for instance, risks presented by: (a) organizational structure; (b) training programs or lack thereof; (c) compensation structure; (d) internal auditing

processes; (e) internal investigation procedures; (f) reporting mechanisms; (g) corporate culture; and (h) employee incentives and disincentives.

9.     In undertaking the reviews to carry out the Mandate, the Monitor shall formulate conclusions based on, among other things: (a) inspection of relevant documents, including the Company's current anti-fraud and environmental policies and procedures; (b) on-site observation of selected systems and procedures of the Company at sample sites; (c) meetings with, and interviews of, relevant current and, where appropriate, former directors, officers, employees, business partners, agents, and other persons at mutually convenient times and places; and (d) analyses, studies, and testing of the Company's compliance program.

*Monitor's Written Work Plans*

10.     To carry out the Mandate, during the Term of the Monitorship, the Monitor shall conduct an initial review and prepare an initial report, followed by at least one follow-up review and report as described in Paragraph 16 below. With respect to the initial report, after consultation with the Company and the Offices, the Monitor shall prepare the first written work plan within sixty calendar days of being retained, and the Company and the Offices shall provide comments within thirty calendar days after receipt of the written work plan. With respect to each follow-up report, after consultation with the Company and the Offices, the Monitor shall

prepare a written work plan at least thirty calendar days prior to commencing a review, and the Company and the Offices shall provide comments within twenty calendar days after receipt of the written work plan. Any disputes between the Company and the Monitor with respect to any written work plan shall be decided by the Offices in their sole discretion.

11.    All written work plans shall identify with reasonable specificity the activities the Monitor plans to undertake in execution of the Mandate, including a written request for documents. The Monitor's work plan for the initial review shall include such steps as are reasonably necessary to conduct an effective initial review in accordance with the Mandate, including by developing an understanding, to the extent the Monitor deems appropriate, of the facts and circumstances surrounding any violations that may have occurred before the date of the Agreement.   In developing such understanding the Monitor is to rely to the extent possible on available information and documents provided by the Company. It is not intended that the Monitor will conduct his or her own inquiry into the historical events that gave rise to the Agreement.

*Initial Review*

12.    The initial review shall commence no later than one hundred twenty calendar days from the date of the engagement of the Monitor (unless otherwise

agreed by the Company, the Monitor, and the Offices).  The Monitor shall issue a

written report within one hundred fifty calendar days of commencing the initial

review, setting forth the Monitor's assessment and, if necessary, making

recommendations reasonably designed to improve the effectiveness of the

Company's program for ensuring compliance with anti-fraud and environmental

laws. The Monitor should consult with the Company concerning his or her findings

and recommendations on an ongoing basis and should consider the Company's

comments and input to the extent the Monitor deems appropriate.  The Monitor may

also choose to share a draft of his or her reports with the Company prior to finalizing

them.   The Monitor's reports need not recite or describe comprehensively the

Company's history or compliance policies, procedures and practices, but rather may

focus on those areas with respect to which the Monitor wishes to make

recommendations, if any, for improvement or which the Monitor otherwise

concludes merit particular attention.  The Monitor shall provide the report to the

Management Board of the Company and contemporaneously transmit copies to the

Deputy Chief – Securities and Financial Fraud Unit, Fraud Section, Criminal

Division, U.S. Department of Justice, at 1400 New York Avenue N.W., Bond

Building, Washington, D.C. 20005; Chief, White Collar Crime Unit, United States

Attorney's Office, Eastern District of Michigan, 211 W. Fort Street, Suite 2001,

Detroit, Michigan 48226; and Deputy Chief, Environmental Crimes Section, U.S. Department of Justice, P.O. Box 7611, Washington, D.C. 20044. After consultation with the Company, the Monitor may extend the time period for issuance of the initial report for a brief period of time with prior written approval of the Offices.

13.     Within one hundred fifty calendar days after receiving the Monitor's initial report, the Company shall adopt and implement all recommendations in the report, unless, within sixty calendar days of receiving the report, the Company notifies in writing the Monitor and the Offices of any recommendations that the Company considers unduly burdensome, inconsistent with applicable law or regulation, impractical, excessively expensive, or otherwise inadvisable. With respect to any such recommendation, the Company need not adopt that recommendation within the one hundred fifty calendar days of receiving the report but shall propose in writing to the Monitor and the Offices an alternative policy, procedure or system designed to achieve the same objective or purpose. As to any recommendation on which the Company and the Monitor do not agree, such parties shall attempt in good faith to reach an agreement within forty-five calendar days after the Company serves the written notice.

14.     In the event the Company and the Monitor are unable to agree on an acceptable alternative proposal, the Company shall promptly consult with the

Exh. 3-8

Offices. The Offices may consider the Monitor's recommendation and the Company's reasons for not adopting the recommendation in determining whether the Company has fully complied with its obligations under the Agreement. Pending such determination, the Company shall not be required to implement any contested recommendation(s).

15. With respect to any recommendation that the Monitor determines cannot reasonably be implemented within one hundred fifty calendar days after receiving the report, the Monitor may extend the time period for implementation with prior written approval of the Offices.

*Follow-Up Review*

16. A follow-up review shall commence no later than one hundred and eighty calendar days after the issuance of the initial report (unless otherwise agreed by the Company, the Monitor and the Offices). No later than sixty days before the end of the Term, the Monitor shall submit to the Offices a final written report ("Certification Report"), setting forth an overview of the Company's remediation efforts to date, including the implementation status of the Monitor's recommendations, and an assessment of the sustainability of the Company's remediation efforts. No later than thirty days before the end of the Term, the Monitor shall certify whether the Company's compliance program, including its policies and

procedures, is reasonably designed and implemented to prevent and detect violations

of the anti-fraud and environmental laws.

*Monitor's Discovery of Potential or Actual Misconduct*

17.  (a) Except as set forth below in sub-paragraphs (b), (c) and (d), should

the Monitor discover during the course of his or her engagement that:

- any defeat device has been designed, installed, or implemented in any

  vehicle of any kind manufactured by the Company's customers, and is

  in use after the date of this Agreement, whether such design, installation

  or implementation has been accomplished by the Company alone or in

  concert with any other person or entity contracting with or working with

  the Company; or

- the Company has made any materially false statement to any

  governmental entity, department, agency, or component within the

  United States, in connection with the certification, sale, offer for sale,

  importation or introduction of any vehicle or vehicle type

(collectively, "Potential Misconduct"), the Monitor shall immediately report the

Potential Misconduct to the Company's General Counsel, Chief Compliance

Officer, and/or Audit Committee for further action, unless the Potential

Misconduct was already so disclosed. The Monitor also may report Potential

Exh. 3-10

Misconduct to the Offices at any time, and shall report Potential Misconduct to the Offices when they request the information.

(b)     In some instances, the Monitor should immediately report Potential Misconduct directly to the Offices and not to the Company. The presence of any of the following factors militates in favor of reporting Potential Misconduct directly to the Offices and not to the Company, namely, where the Potential Misconduct:   (1) poses a risk to public health or safety or the environment; (2) involves senior management of the Company; (3) involves obstruction of justice; or (4) otherwise poses a substantial risk of harm.

(c)     If the Monitor believes that any Potential Misconduct actually occurred or may constitute a criminal or regulatory violation of U.S. law ("Actual Misconduct"), the Monitor shall immediately report the Actual Misconduct to the Offices. When the Monitor discovers Actual Misconduct, the Monitor shall disclose the Actual Misconduct solely to the Offices, and, in such cases, disclosure of the Actual Misconduct to the General Counsel, Chief Compliance Officer, and/or the Audit Committee of the Company should occur as the Offices and the Monitor deem appropriate under the circumstances.

(d)     The Monitor shall address in his or her reports the appropriateness of the Company's response to disclosed Potential Misconduct or

Actual Misconduct, whether previously disclosed to the Offices or not. Further, if the Company or any entity or person working directly or indirectly for or on behalf of the Company withholds information necessary for the performance of the Monitor's responsibilities and the Monitor believes that such withholding is without just cause, the Monitor shall also immediately disclose that fact to the Offices and address the Company's failure to disclose the necessary information in his or her reports.

(e) Neither the Company nor anyone acting on its behalf shall take any action to retaliate against the Monitor for any such disclosures or for any other reason.

*Meetings During Pendency of Monitorship*

18. The Monitor shall meet with the Offices within thirty calendar days after providing each report to the Offices to discuss the report, to be followed by a meeting between the Offices, the Monitor, and the Company.

19. At least annually, and more frequently if appropriate, representatives from the Company and the Offices will meet together to discuss the Monitorship and any suggestions, comments, or improvements the Company may wish to discuss with or propose to the Offices, including with respect to the scope or costs of the Monitorship.

Exh. 3-12

*Contemplated Confidentiality of Monitor's Reports*

20.    The reports will likely include proprietary, financial, confidential, and competitive business information.  Moreover, public disclosure of the reports could discourage cooperation, or impede pending or potential government investigations and thus undermine the objectives of the Monitorship.  For these reasons, among others, the reports and the contents thereof are intended to remain and shall remain non-public, except as otherwise agreed to by the parties in writing, or except to the extent that the Offices determine in their sole discretion that disclosure would be in furtherance of the Offices' discharge of their duties and responsibilities or is otherwise required by law.

Exh. 3-13